**Sadie M. NANCE, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security,[1] Defendant.**

**No. CIV.A.01–036–SLR.**

United States District Court, D. Delaware.

March 22, 2002.

---

1. Jo Anne B. Barnhart became the Commissioner of Social Security, effective November 14, 2001, to succeed Acting Commissioner Larry G. Massanari, who succeeded Commissioner Kenneth S. Apfel. Pursuant to Fed. R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g), Jo Anne B. Barnhart is automatically substituted as the defendant in this action.

Gary C. Linarducci, Esquire, New Castle, Delaware. Counsel for Plaintiff.

Colm F. Connolly, United States Attorney, Patricia C. Hannigan, Assistant United States Attorney, United States Attorney's Office, Wilmington, Delaware. Counsel for Defendant. Of Counsel: James A. Winn, Regional Chief Counsel, Kelly C. Connelly, Assistant Regional Counsel, Social Security Administration, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiff Sadie M. Nance filed this action against defendant Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), on January 14, 2001. (D.I.1) Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a decision by the Commissioner denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Currently before the court is plaintiff's motion for summary judgment (D.I.8) and defendant's cross-motion for summary judgment (D.I.11). For the reasons that follow, the court shall grant plaintiff's motion for summary judgment and deny defendant's cross-motion for summary judgment.

## II. BACKGROUND

### A. Procedural History

On March 16, 1995 plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. (D.I. 12 at 1) Plaintiff alleges that, as a result of injuring her right hand at work on February 18, 1983, she suffers from severe right arm and hand impairment. (D.I. 9 at 6, 8) Plaintiff's claim was denied both initially and upon reconsideration. (*Id.* at 6) Plaintiff requested and subsequently received a hearing before an administrative law judge ("ALJ"), held on July 24, 1997. (*Id.*) On September 9, 1997, the ALJ issued a decision denying plaintiff's claim. (D.I. 4 at 13–29) In considering the entire record the ALJ found the following:

1. Claimant met the insured status requirements of the Social Security Act on February 18, 1983, and continued to meet them through June 30, 1992.

2. There is insufficient evidence to establish that claimant engaged in substantial gainful activity after February 18, 1983 (20 CFR 404.1520(b)).

3. Claimant has a severe right upper extremity condition, but she did not have an impairment or combination of impairments listed, or medically equal to one listed, in Appendix 1, Subpart P, Regulations No. 4 during the period February 18, 1983 through June 30, 1992.

4. Claimant's allegations regarding her impairments and pain are generally credible, but not to the extent that she was totally disabled and unable to perform all work activity during the period February 18, 1983, through June 30, 1992.

5. Claimant had the residual functional capacity during the period February 18, 1983, through June 30, 1992, to lift no more than 10 pounds at a time with her non-dominant left upper extremity and occasional lifting or carrying of articles like docket files, ledgers, or small tools in her right, but she has no limitations in sitting, standing, or walking, and is limited in use of the dominant right hand to personal care needs, some writing, light cooking, light cleaning, and lifting as set forth above, but has no prolonged use of the right hand (20 CFR 404.1560).

6. Claimant's past relevant work as a corrections officer was semi-skilled, medium work, and her past relevant work as a sewing machine operator was low semi-skilled, light work (20 CFR 404.1560).

7. Claimant was unable to perform her past relevant work during the period February 18, 1983, through June 30, 1992 (20 CFR 404.1520(e)).

8. Claimant has no skills transferable from her past relevant work to the work within her residual functional capacity. (20 CFR 404.1568(d)).

9. Claimant was 34 years of age on the alleged date of onset of disability, February 18, 1983, and was considered a "younger individual" (20 CFR 404.1563).

10. Claimant has a high school education (20 CFR 404.1564).

11. If claimant had a residual functional capacity for the full range of light work, and considering her age, education, and work experience, Medical–Vocational Rule 202.20–22 of Appendix 2, Subpart P, Regulations No. 4, would direct a finding of "not disabled." Since claimant has non-exertional limitations, cited above, the Medical–Vocational Rules will be used only as a framework for decision making.

12. Jobs in the national and local economies which could have been performed by a person of the same age, education, work experience, and residual functional capacity as claimant, included security monitor, charge account interviewer, and messenger. These jobs exist in significant numbers in the national economy.

13. Claimant was not "disabled," as defined in the Social Security Act, at any time during the period February 18, 1983, through June 30, 1992 (20 CFR 404.1520(f)).

(*Id.* at 27–29)

On December 15, 2000, the Appeals Council denied plaintiff's request for review, concluding that "there is no basis under the ... regulations for granting your request for review .... the [ALJ's] decision stands as the final decision of the Commissioner." (*Id.* at 4) In reaching its decision the Appeals Counsel made the following findings: (1) there was no reason, based on additional evidence, to change the ALJ's decision; (2) several reports from Dr. Arminio, submitted as additional evidence, were already in the record and had been properly considered by the ALJ; (3) the other reports were duplicative of those already in the record; (4) the Vocational Rehabilitation evidence did show plaintiff was capable of "performing competitive work activity"; and (5) the ALJ properly did not consider the hiring practices of employers or the fact that plaintiff was not hired as a basis for finding plaintiff disabled. (*Id.* at 4–5)

Several new pieces of evidence were submitted to the Appeals Council, including reports from the Delaware Division of Vocational Rehabilitation (*id.* at 347–391) and letters written in 1988 by one of plaintiff's treating physicians, Dr. Arminio.

The Council found that Dr. Arminio's letters, while not available to the ALJ, corroborate the doctor's other letters and statements during this time, which were available to the ALJ. (*Id.* at 398–400) The evidence submitted to the Appeals Council also included a visit to Kent General Hospital on January 31, 1990, by plaintiff for severe pain in her neck, head and left side. (*Id.* at 409)

Plaintiff now seeks review of this decision before this court pursuant to 42 U.S.C. § 405(g).

**B. Facts Evinced from Plaintiff at the Administrative Law Hearing and Through Disability Self–Report**

Plaintiff was born on November 18, 1948, and was 34 years old on February 18, 1983, the date of onset of the alleged disability. (*Id.* at 38) She lives with her two daughters. (*Id.* at 428, 429) As of the date of plaintiff's alleged disability she had completed the twelfth grade and was

working for the State of Delaware as a corrections officer; in the past, she had worked as a sewing machine operator. (*Id.* at 38, 71) Plaintiff testified that she injured her right hand when she slammed it up against a steel door jam while on duty February 18, 1983. (*Id.* at 431) Plaintiff is right-handed. (*Id.* at 417)

The injury caused nerve damage which necessitated several surgeries and, allegedly, kept plaintiff from returning to work at the Department of Correction. (*Id.* at 79–86) She worked for brief periods at several jobs from 1986 to 1991, apparently through a work/study program associated with state-sponsored vocational rehabilitation counseling. (*Id.* at 414) She attended college classes for a brief period of time, also as part of the rehabilitation program. (*Id.* at 415) At the hearing, plaintiff testified that the pain in her arm, shoulder, and neck kept her from working. (*Id.* at 417) She "wanted to try [to work] but it just didn't work out." (*Id.*) Plaintiff testified the surgeries on her hand failed to relieve the pain and swelling which afflicted her hand, right arm and shoulder. (*Id.* at 87, 428, 435–36)

Plaintiff testified that, as of the hearing date, she was taking Soma and Vicodin, as prescribed by her physician. (*Id.* at 420) She claimed that Vicodin relieved the pain only about "forty percent of the time." (*Id.* at 436) She also testified the Vicodin caused her depression, sleeplessness, and problems with memory and concentration. (*Id.* at 436) Plaintiff asserted that Soma made her feel like she was in a "zombie state." (*Id.* at 437) When taking medication, she cannot go anywhere, so she takes it only as absolutely necessary. (*Id.* at 437)

Besides the pain medication, plaintiff had also used a TENS unit, received nerve blocks (which only helped for a day or two), and had occasionally worn an arm brace. (*Id.* at 420) Plaintiff testified that she was under the care of Dr. Arminio, a hand surgeon, but saw him rarely because all he could do was prescribe medication. (*Id.* at 420) She described her pain as six on a one to ten scale on a normal day, but also testified that other days the pain was better or worse. (*Id.* at 421) She claimed that, in the previous two or three years, on approximately six separate occasions the pain was so bad she had to stay in bed. (*Id.* at 421) In addition, she stated that her arm was so hypersensitive that long sleeves rubbing on the arm made it feel "like when you hit your funny bone ... and it shoots pain up through [your] arm." (*Id.* at 428.

Plaintiff also testified that she had been diagnosed with asthma, diabetes, and coronary heart disease. (*Id.* at 421)

Plaintiff claimed that using her right hand in daily activities aggravated the pain. (*Id.* at 418) Plaintiff stated that she sometimes needed help washing her hair and getting dressed, and that she could do light chores and some cooking, although that aggravated the pain sometimes. (*Id.* at 429)

### C. Vocational Evidence

During the period in question plaintiff participated in work study programs and had sporadic periods of employment: two employers in 1986, two employers in 1988, one employer in 1989, two employers in 1990, and one employer in 1991. (*Id.* at 153, 341–45) Plaintiff participated in a vocational rehabilitation program through the State of Delaware. (Id. at 347–391)

In a June 6, 1989 report from the Delaware Division of Vocational Rehabilitation, the Work Adjustment Specialist noted that plaintiff was "faced with the problems of limited use of her right hand" in trying to find a job. (*Id.* at 359) On March 19, 1990, plaintiff's vocational counselor noted that plaintiff discontinued her training on the

computer because it put too much strain on her good hand. (*Id.* at 375)

During the administrative hearing on plaintiff's disability appeal, the ALJ called Margaret A. Preno as a vocational expert. (*Id.* at 440) Ms. Preno opined as to the exertional and skill requirements of plaintiff's prior jobs, and concluded that plaintiff's skills were demonstrated at the semi-skilled, medium level. (*Id.*) Ms. Preno testified:

> Her position as a, a correction officer in a prison, The Dictionary of Occupational Titles defines that position as a semi-skilled and the exertional level at medium .... the position as a sewing machine operator ... [is defined] at an exertional level of light and it is ... [a] low-level semi-skilled position.

(*Id.* at 441)

The ALJ posed hypotheticals to the vocational expert to determine if there were jobs in the national economy that plaintiff, with her skills and limitations, could have performed. (*Id.*)

The first hypothetical asked if plaintiff, with "limited use of ... her right dominant hand ... [and able to] do a little bit of writing, light cooking and light cleaning with her right hand but no prolonged use of the right hand," could do her past work. (*Id.* at 442) The vocational expert testified that plaintiff could not perform her past relevant work but, based on the hypothetical, plaintiff could perform other jobs in the national and local economy including security monitor, charge account interviewer and messenger. (*Id.*) These jobs existed in sufficient numbers in the national and local economies. (*Id.*)

The ALJ next asked if plaintiff had a "mild to moderate (INAUDIBLE) sequence of concentration because of pain, would she be able to perform these jobs?" (*Id.* at 443) The vocational expert testified that with this limitation plaintiff could perform those jobs because "[they] are un-skilled and do not require intense concentration." (*Id.*)

On cross-examination, plaintiff's attorney asked if a person experiencing moderate to severe pain could perform the jobs. (*Id.*) The vocational expert testified that a person experiencing moderate pain could perform the jobs, but if the pain were severe, it would be too distracting and the person would not be able to perform them. (*Id.*) If the pain interfered significantly with concentration, the person would not be able to perform any job in the national or local economy. (*Id.*)

When the attorney adjusted the hypothetical back to a mild to moderate level of pain, but specified that the person had no use of her right hand, the vocational expert testified that the person would be able to perform only the security monitor position. (*Id.*)

The attorney then asked the vocational expert if taking medication that severely affected plaintiff's ability to concentrate would preclude plaintiff from performing the specified jobs. (*Id.* at 443–44) In response, the vocational expert testified that "if the side effects of the medication was so severe that she could not concentrate and carry out an unskilled, simple, one, two, or three step position, no, she would not be able to perform her jobs." (*Id.* at 444) When asked about a person taking Soma and Vicodin specifically, the expert responded that taking medication would not affect the person's ability to get one of the identified jobs "as long as the medication did not interfere with her performance on the job." (*Id.* at 445) When plaintiff's attorney then described side-effects of grogginess, sleepiness, euphoria, and unclear thinking, the expert testified that if a prospective employer were told that the person was taking a drug with those side effects, "it would be difficult for her to get a job." (*Id.*)

## D. Medical Evidence

### 1. Right Hand and Wrist

On February 22, 1983, four days after her injury, plaintiff saw Dr. James V. Gallagher, M.D. (*Id.* at 101) X-rays taken at the emergency room showed the right wrist and hand to be normal except for a small nodule on the back of her wrist that had been there for a month prior to the accident. (*Id.*) Dr. Gallagher placed plaintiff's arm in a sling and had her return in a week. (*Id.*) At the next appointment on March 1, 1983 plaintiff had not improved and the small nodule had grown. (*Id.*) Dr. Gallagher determined it was a ganglion, aspirated it and noted that plaintiff was unable to return to work. (*Id.*) Four days later plaintiff's pain seemed relieved and the doctor noted she could return to work, but then on March 8, 1983 plaintiff returned with more pain and swelling. (*Id.*) Dr. Gallagher put plaintiff in a short arm cast and told her to not return to work. (*Id.*)

Over the next several months, plaintiff continued to see Dr. Gallagher because of pain, swelling and numbness in her right hand; he prescribed various pain medications and therapies. (*Id.* at 100) On September 6, 1983, Dr. Gallagher re-diagnosed the ganglion on her right hand and then, on September 9, excised the ganglion. (*Id.*) Despite the operation and follow-up physical therapy, plaintiff's hand and wrist continued to cause her pain and she was unable to work. (*Id.* at 99)

After an examination in March 1984 for plaintiff's insurance company, Dr. Errol Ger concluded that plaintiff may have reflex sympathetic dystrophy. (*Id.* at 98) At this time plaintiff could lift twenty pounds and grip strength in the right hand was thirteen PSI. (*Id.*)

On March 2, 1984, Dr. Gallagher diagnosed plaintiff with a neuroma trapped in the scar tissue on the back of her right hand. (*Id.*). The neuroma was removed on March 9, 1984, and plaintiff was put in a short arm splint and given Demerol for the pain (*Id.*) The excision of the neuroma was ineffective, so another operation to transplant the radial nerve was scheduled for May 1, 1984. (*Id.* at 98, 103) Because the scar tissue was very sensitive, Dr. Gallagher recommended plaintiff see Dr. Richard P. DuShuttle for further evaluation. (*Id.* at 95)

Dr. DuShuttle found symptoms of a "painful neuroma" in the right wrist. (*Id.* at 96) Dr. DuShuttle discussed a physical therapy plan that included range of motion exercises, the use of a TENS unit and rubbing the scar with cocoa butter. (*Id.*) The doctor predicted that, following this plan, plaintiff's symptoms would be reduced within a year. (*Id.*) In September 1984, plaintiff saw Dr. DuShuttle for tenderness in her right neck and shoulder, which the doctor attributed to a "trapezius muscle spasm." (*Id.*) In a June 1985 visit to Dr. Gallagher, plaintiff continued to complain of tenderness over her scar and the doctor noted "possible sympathetic dystrophy." (*Id.* at 95) Later in the month Dr. Gallagher informed plaintiff that there was nothing more he could do for her injury and placed her in a wrist splint. (*Id.*)

At the recommendation of Dr. Gallagher, plaintiff received an operation on March 11, 1986 at Johns Hopkins Hospital to relieve her pain.[2] (Id. at 178) Plaintiff

2. The operation was performed by Dr. James N. Campbell and Dr. A. Lee Dellon and consisted of "[r]esection of neuroma of the radial sensory nerve and implantation of the nerve proximally into the brachioradialis muscle [and] ... [r]elease of the tendons from the first and third extensor tendon compartments." (*Id.* at 178)

was discharged several days after the operation, "doing well." (*Id.* at 182)

Dr. Joseph A. Arminio, a specialist in hand surgery, first examined plaintiff during an independent medical examination in March 1985. (*Id.* at 148) After observing tenderness in the radial nerve of her wrist and hand, he recommended use of a prosthetic splint to alleviate some of her discomfort and allow plaintiff to use her fingers, while keeping her arm static. (*Id.* at 149) He also noted that plaintiff had "at least a 10% loss for her upper right extremity," which could worsen to twenty percent. (*Id.*)

In a follow up visit in May 1986, Dr. Arminio noted that the March 1986 procedure at Johns Hopkins had not achieved the desired results and plaintiff still complained of pain, could not use her right hand, and "continue[d] to be markedly disabled at this time." (*Id.* at 147) Dr. Arminio remarked that "once the superficial nerve becomes irritated and symptomatic, the chances of reversing the problem are slim at best" and plaintiff "falls into the category of irreparable disability with little chance of improvement." (*Id.*) His only suggestion for relief was to completely immobilize the arm and wrist, which in the end would result in a nonusable upper extremity. (*Id.*) In 1988 letters provided to the Appeals Council during its review, Dr. Arminio stated that the type of surgery plaintiff underwent at Johns Hopkins "does not always prove successful in relieving pain," and did not in plaintiff's case. (Id. at 398)

In November 1987, plaintiff had an EMG and nerve conduction study "consistent with a right radial nerve entrapment in the region of the wrist." (*Id.* at 306) Dr. Arminio again examined plaintiff on January 12, 1988. (*Id.* at 144) Plaintiff had not improved, and Dr. Arminio recommended immobilizing her right extremity in a splint and a rehabilitation program to

increase the dominance of her left arm and hand. (*Id.*) He believed this could help her to perform "one-handed light work with her left upper extremity." (*Id.*) In 1988 letters, Dr. Arminio stated that plaintiff "remain[ed] partially disabled" (*id.* at 400) but could look for work "which would entail light duties and minimal use of her right hand" (*id.* at 398).

Plaintiff next saw Dr. Gallagher in December 1988. (*Id.* at 129) She was complaining of pain in the right hand, wrist and forearm. (*Id.*) An X-ray of the neck and cervical spine was normal, but the right shoulder indicated rotator cuff tendinitis. (*Id.*) Plaintiff was prescribed Percodan and Voltaren. (*Id.*)

In February 1989, plaintiff saw Dr. Gallagher for pain in the left side of her neck and pain in her right hand. (*Id.* at 128) Dr. Gallagher prescribed Percocet and a TENS unit. (*Id.*) An EMG and nerve conduction study conducted on March 6, 1989 supported a "mild to moderate compromise" in nerve function in plaintiff's left arm. (*Id.* at 108) Dr. Gallagher diagnosed plaintiff with a ganglion on the back of her right hand, which he aspirated on March 23, 1989. (*Id.* at 128) Dr. Gallagher also noted that plaintiff was going to school to learn computers. (*Id.* at 127)

In April 1989, Dr. Gallagher opined that plaintiff should go back to work in a light or sedentary capacity. (*Id.*) Dr. Gallagher filled out a physical capacities form in July 1989 that stated plaintiff could probably drive a car but only for about one hour. (*Id.*) He also stated that her main problem was pain in the right forearm and right hand. (*Id.*) In November 1989 plaintiff had a nerve dissected out of her right hand. (*Id.*) Dr. Gallagher diagnosed plaintiff with tendinitis in her right wrist in March 1990 and concluded she was unable to work. (*Id.*)

Another examination by Dr. Arminio in July 1990 found that plaintiff still suffered from sporadic pain, which was only temporarily relieved by the surgical procedures. (*Id.* at 139–143) In a resulting report, Dr. Arminio concluded that a post-traumatic neuroma that had developed after treatment of her first ganglion caused her ongoing problems and subsequent surgeries. (*Id.* at 141) He did not believe further surgery could help. (*Id.*) To ease her discomfort during episodes of increased pain, he recommended plaintiff use a resting splint for her wrist, arm and shoulder and apply heat and/or ice; she could not expect to be productive during peak episodes of pain. (*Id.*) Dr. Arminio opined that pain in her right arm caused her to have several operations, which in turn caused more pain and discomfort. After a temporary period of "quiescence" of the pain and discomfort, the pain returned and further restricted use of her arm. (*Id.* at 139) "The pain is sporadic in nature, thus she has good days and bad days; and performing activities on a daily basis also becomes sporadic and inconsistent." (*Id.*) Dr. Arminio stated that "the sum total of this dilemma is a person who has become deranged and who has a pain sequence that cannot be controlled in spite of the multiple surgical procedures which have proven to have been of only temporary help in relieving her pain." (*Id.* at 140)

Dr. Arminio further concluded that the sporadic and unpredictable nature of the pain kept her from working a normal work week, and pressure by family and employers exacerbated the problems. (*Id.* at 139–142) "She remains unemployable because she cannot work a normal work week on any type of consistent basis in any type of job setting." (*Id.* at 140) He noted that "recurrent bouts of severe pain" would make it difficult to maintain a steady job in the future. (*Id.* at 141) He opined, "I seriously doubt that she will ever be able to return to work." (*Id.*) He

also noted that he had other patients with similar nerve problems who were not able to work for 15 or 20 years. (*Id.*)

Plaintiff saw Dr. Gallagher in July 1990 for swelling and tightness in her right shoulder and right hand; he prescribed Lasix and Soma. In November 1990 and March 1991, he prescribed Percoset for pain. (*Id.* at 126)

Plaintiff visited Dr. Arminio again in February 1991 for discomfort in her forearm, which he attributed to superficial radial nerve irritation. (*Id.* at 137) She called Dr. Arminio again in May 1991 for the same problem. (*Id.*) The doctor prescribed a gutter splint to stabilize her wrist and possibly regain function in her hand. (*Id.*) He opined that if plaintiff were to wear a splint she probably could look for some sort of light activity, something which he had suggested numerous times in the past. (*Id.*)

After an August 1991 examination, Dr. Gallagher noted that plaintiff abducted the right shoulder to 115 degrees and had limited internal and external rotation. (*Id.* at 125) He also noted that pain in the right forearm and wrist had increased, and plaintiff had a thirty percent impairment in her right upper extremity. (*Id.*) Plaintiff got prescriptions for Vicodin in October and November 1991. (*Id.*) In November 1991, Dr. Gallagher noted that plaintiff's impairment rating stood at thirty percent and he prescribed Vicodin Extra Strength. (*Id.* at 124) Dr. Gallagher continued to prescribe Vicodin Extra Strength and see plaintiff on a regular basis throughout 1992. (*Id.* at 123–124)

Dr. Gallagher passed away in early 1993. (*Id.* at 135) However, Dr. Glenn R. Hardy performed a nerve conduction examination of plaintiff's right hand in January 1993 at the request of Dr. Gallagher. (*Id.* at 109) His notes state:

The sensation across the fingertips including the ulnar innervated little finger

appears to be intact. Her strength appears to be normal without significant hand intrinsic atrophy, she does have a positive Tinel's sign at the elbow as well as at the wrist with slight discomfort on palpation in the cubital tunnel region. Her reflexes are 2+ in the biceps and triceps.

(*Id.* at 110) He found no evidence of "significant nerve entrapment or peripheral polyneuropathy" and found little change from a previous nerve study done in 1989. (*Id.* at 110–111)

Plaintiff saw Dr. Arminio in April 1993, almost a year after plaintiff's date last insured for disability benefits (June 30, 1992). (*Id.* at 17, 135) Plaintiff continued to suffer pain in her right forearm and wrist, so Dr. Arminio placed her on Lodine, a nonsteroidal anti-inflammatory medication. (*Id.* at 136) Dr. Arminio re-examined plaintiff in May of the same year and suggested that he could do no more for her than prescribe pain medication. (*Id.* at 134) In a March 1994 report, Dr. Arminio stated his belief that plaintiff "continues to be totally disabled because of the ongoing irritation of the superficial radial nerve in her right upper extremity." (*Id.* at 133) "For all intents and purposes ...[plaintiff] is totally and permanently disabled from doing work of any kind." (*Id.* at 133)

Dr. Errol Ger performed a consultative examination on plaintiff in June of 1995; he found limited range of motion in her right upper extremity and full range of motion in her left shoulder. (*Id.* at 152) Plaintiff had extension of both wrists to seventy degrees, flexion of the left wrist to eighty degrees and flexion of the right wrist to thirty degrees. (*Id.*) She had full range of motion of the forearms, but had a grip strength of only zero to one pound on the right hand. (*Id.*) The Tinel's, Allens, Addison's, Phalen's, and reverse Phalen's tests were negative. (*Id.*) The doctor also noted that plaintiff continued to be treated with anti-inflammatory medications, Demerol and muscle relaxants. (*Id.*) Lifting and use of the right hand presented a problem. (*Id.*)

Dr. Arminio completed a Residual Functional Capacity assessment for plaintiff in May 1997. (*Id.* at 294–297) He found that plaintiff continued to suffer pain and incapacity in her right upper extremity and continued to take pain medication that diminished her capacity to concentrate and work. (*Id.*) When asked if plaintiff could perform sedentary work, Dr. Arminio said no, "she is not capable of working on a scheduled basis; when she is relatively symptom free, she could perform light sedentary activities; but she never knows when she will have a severe attack of superficial radial nerve pain which makes it impossible to leave her home." (*Id.* at 297) At the time of the assessment plaintiff could lift less than ten pounds, stand or walk for a total of at least 2 hours in an eight hour day, sit for the same amount of time, stand for about six hours in an eight hour day and had limited ability to push or pull in her upper extremity. (*Id.* at 294–295)

The State Disability Determination Service also completed residual functional capacity assessments on the plaintiff. (*Id.* at 43–50) The assessor concluded that claimant was able to lift and carry up to 20 pounds occasionally and 10 pounds frequently; was able to sit, stand or walk for up to six hours out of an eight hour day; was limited to occasional climbing of ropes, ladders, or scaffolding; was limited to frequent climbing of stairs or ramps, balancing, stooping, kneeling, crouching, or crawling; and was limited in reaching with the right upper extremity.

### 2. Plantar Fascitis

On October 6, 1989, Dr. Gallagher treated plaintiff for plantar fascitis of the right

heel and reported that discomfort from the condition had improved after an injection.[3] (*Id.* at 126) Plaintiff continued to complain of pain in her foot and had to periodically elevate the foot and occasionally use a wheelchair or electric cart to shop. (*Id.* at 439–40) Dr. DuShuttle performed a surgical procedure in August 1994 to release the pressure caused by the plantar fascitis. (*Id.* at 114, 115) Plaintiff was on crutches for about eight months after the surgery. (*Id.* at 438)

### 3. Other Conditions

Plaintiff was diagnosed with mild coronary artery disease on June 15, 1994. (*Id.* at 272) A medical record from Kent General Hospital shows that plaintiff had been complaining of bouts of chest pain beginning in 1993. (*Id.* at 269) Plaintiff also has a history of diabetes and occasionally suffers from peripheral neuropathy. (*Id.* at 426–28) In addition, plaintiff has had problems with asthma and is overweight. (*Id.* at 270)

Plaintiff has also experienced depression and anxiety. In August 1990, Dr. Arminio explained that the frustration over not getting better and the lack of understanding from family and others had increased plaintiff's depression and anxiety. (*Id.* at 140) Plaintiff testified that she is under treatment and takes prescription drugs to control her depression. (*Id.* at 422–26)

### E. ALJ Decision

First, the ALJ concluded that plaintiff had not engaged in substantial gainful work activity since the alleged onset date of her disability, February 18, 1983, except for the year 1991, for which he deferred a determination. (*Id.* at 18) The ALJ cited Social Security Ruling 84–25 to support his finding that plaintiff's sporadic employment in 1986, 1988, 1989, 1990, and 1993 at low wages could not be considered substantial gainful activity. (*Id.* at 17–18)

He next concluded that plaintiff's right upper extremity condition had "more than a minimal impact on her ability to be gainfully employed," and thus found the condition to be a severe impairment. (*Id.* at 18) He found the other conditions, plantar fascitis, diabetes, coronary artery disease, asthma, and obesity, to be non-severe impairments. (*Id.* at 18–19)

In the third step of the evaluation process, the ALJ determined that plaintiff's right upper extremity condition failed to "meet the severity requirements of listing 1.13 or any other listing in Section 1.00 or 11.00 of Appendix 1 during the period" in question. (*Id.* at 22) Specifically, "[t]he medical record and claimant's activities do not demonstrate that she lacked gross use of her right upper extremity during the period in question." (*Id.*) The ALJ explained that, to satisfy the severity requirements of listing 1.13, "the medical record would need to establish that major function was not restored to claimant's right upper extremity subsequent to her injury on February 18, 1983." (*Id.* at 19)

To support his listing determination, the ALJ detailed the medical evidence he considered. First, the ALJ stated that he could not use Dr. Arminio's opinion of March 24, 1994 that plaintiff was "totally and permanently disabled from doing work of any kind" because it came after the date last insured, June 30, 1992.[4] (*Id.* at 19)

---

**3.** According to plaintiff, plantar fascitis is an inflammation of the foot muscle. (D.I. 9 at 8)

**4.** It is not clear from the ALJ's opinion whether he was discounting Dr. Arminio's opinion about her ability to work or about the functionality of her right arm. Plaintiff's ability to work or "residual functional capacity" is not relevant to a listing determination. If the ALJ considered plaintiff's work capacity as part of his determination, this was improper.

The ALJ then noted plaintiff's surgeries in September 1993, March and May 1984, March 1986, and 1988 and recognized that they failed to provide plaintiff relief from pain. (*Id.* at 20) He did not comment on whether these surgeries comprised "staged surgery" as required by listing 1.13.

The ALJ then considered numerous test results and physician's reports.[5] The ALJ also considered plaintiff's testimony that after her surgeries she "experienced pain in her right hand, wrist, arm, and shoulder, she could do no driving and no lifting over five pounds, and occasionally needed help with dressing and hair washing." (*Id.* at 20)

The ALJ summarized the above cited evidence as follows:

> [C]laimant had right hand grip strength of 30 pounds in 1985, she was attending computer school and could drive a car in 1989, Dr. Arminio thought she could engage in light activities with an arm splint in 1991, and in 1993 Dr. Hardy found "normal" strength in her right hand. The medical record does not demonstrate that claimant lacked gross use of her right hand during the period February 18, 1983, through June 30, 1992, and Dr. Gallagher's opinion that she could drive a vehicle in 1989 is strong evidence for this. In addition, as previously noted, claimant engaged in sporadic work activity in the years 1986, 1988, 1989, and 1990, and earned $4447.42 in the year 1991.

(*Id.* at 22) From this, the ALJ concluded that plaintiff retained gross use of her right hand during the relevant period and, therefore, did not meet the requirements of listing 1.13 or any other listing. (*Id.*) He also found that when claimant's impairments were considered in combination, they were not equivalent in severity to any listing. (*Id.*)

The ALJ next considered plaintiff's residual functional capacity to perform her past relevant work or any other work in the national economy. (*Id.* at 22–25) The ALJ did not concur with the State Disability Determination Service's finding in 1995 that plaintiff could lift and carry at the light exertional level. (*Id.* at 23)

After considering Dr. Arminio's opinion of May 1, 1986 that plaintiff may never have "full return of usefulness of the upper extremity," the ALJ concluded that the Social Security Rules and Regulations did not require a full return of usefulness for claimant to be considered capable of work activity. (*Id.* at 23) Rather, plaintiff needed full use of one upper extremity and gross use of the other. (*Id.*) The ALJ concluded that plaintiff had gross use of her right upper extremity, basing this on Dr. Gallagher's 1989 opinion that she could drive for about an hour and Dr. Arminio's 1990 opinion that "she had partial use of her arm in that there were times when she could use her arm rather successfully and other times when she could not use it at all." (*Id.*)

The ALJ also considered portions of the August 1990 report in which Dr. Arminio opined that plaintiff would never be able return to work "in the normal sense" because her ongoing pain prevented her from maintaining a normal schedule or working continually at one job for any length of time. (*Id.*) The ALJ noted that Dr. Arminio had also stated that claimant felt less pain when her arm was immobilized in a splint. The ALJ concluded:

---

5. These included diagnostic tests for nerve function (*id.* at 20); Dr. Gallagher's examination notes and reports from 1983 through 1993 (*id.* at 20–21); Dr. Arminio's notes and reports from 1985 through 1993 (*id.* at 21–22); and an examination by Dr. Hardy in 1993 (*id.* at 22).

Although deference is usually given the opinion of a treating physician, in this regard it is noted that Dr. Arminio has not substantiated his opinion that claimant can never return to work with evidence that she is incapable of sustaining work at sedentary jobs which require no use of her upper extremity, or jobs which require use of her left upper extremity with the right upper extremity immobilized in a splint.

(*Id.*)

The ALJ quotes Dr. Arminio's statement that plaintiff "can sometimes use her right upper extremity 'rather successfully'" and compares that to plaintiff's testimony that she sometimes needs help to wash her hair or get dressed. (*Id.* at 24) The ALJ infers from this that plaintiff can sometimes use both of her upper extremities to wash her hair or get dressed. (*Id.*) He then concludes: "Accordingly, no weight will be given the opinion of Dr. Arminio insofar as it suggests that claimant is totally unable to engage in all work activity during the period February 18, 1983, through June 30, 1992." (*Id.*)

The ALJ went on to find that plaintiff "has a severe right upper extremity condition with progressively worsening pain." (*Id.*) The ALJ found "claimant to be generally credible in her allegations regarding her impairments and pain, but not to the extent she was totally disabled and could perform no work." (*Id.*) He concluded from his review of the record that prior to

June 30, 1992 "plaintiff received very little treatment for several years, indicating that the pain was not as severe at that time as it later became." [6] (*Id.*) He also noted her sporadic work activity from 1986 to 1992 and concluded that her pain "was less at that time." (*Id.*)

Ultimately, the ALJ found that, during the period in question, plaintiff had a residual functional capacity to:

lift no more that 10 pounds at a time with the non-dominant left hand and occasional lifting or carrying of articles like docket files, ledgers, or small tools in the right. In addition, she has no limitations on sitting, standing, or walking; and use of her dominant right hand was limited to personal care needs, some writing, light cooking, light cleaning, but no prolonged use of the right hand.

(*Id.* at 25) Based on this residual functional capacity, the ALJ determined that plaintiff could not perform her past relevant work during the period in question. (*Id.*) He therefore went on to the final step in the disability determination process to consider whether plaintiff could have performed any other jobs in the national economy.

After considering the vocational expert's testimony,[7] the ALJ concluded that significant numbers of jobs existed in the national economy to which claimant could have adjusted during the period in question. (*Id.* at 27) The ALJ noted that, while plaintiff's pain got progressively worse

---

6. The record reflects that, during the period from approximately December 1988 through September 1992, plaintiff sought medical treatment for pain at least twenty times. (D.I. 4, at 123–129) Each time plaintiff complained of pain and swelling either in her right arm and shoulder or her back, neck and left shoulder. (*Id.*) Dr. Gallagher prescribed a variety of drugs, including Percocet, Vicodin ES, Percodan, Flexeril, Lasix and Soma. (*Id.*) At various times plaintiff complained that the drugs made her drowsy. (*Id.*)

7. The ALJ misstates the vocational expert's testimony on one point. The ALJ says that the expert testified that taking Soma or Vicodin would not affect performance on the identified jobs or plaintiff's ability to get those jobs. The expert's actual testimony, when posed a hypothetical that included taking Soma and Vicodin, was that taking medication would not affect the person's ability to get one of the identified jobs "as long as the medication did not interfere with her performance on the job." (*Id.* at 445)

over the years, it was "not significantly limiting prior to June 30, 1992" and "the medical record lacks evidence that claimant's medications prior to June 30, 1992 interfered with her ability to perform simple job tasks." (*Id.*) He also cited the fact that plaintiff was enrolled in computer classes in 1989 as evidence that her concentration was not significantly impaired prior to June 30, 1992. (*Id.*)

## III. STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive," and the court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence." 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(E) (1999); *see Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986). As the Supreme Court has held,

"[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established. . . . It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Fed.R.Civ.P. 56:

The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g),

"[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehear-

**316**

ing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir.1984).

## IV. DISCUSSION

In the case at bar, plaintiff challenges the Commissioner's decisions that: (1) plaintiff's disability did not meet any of the impairments listed in 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (2001), and in particular, listing 1.13; and (2) plaintiff had residual functional capacity to perform other available work in the national economy. To obtain disability benefits, plaintiff must show that she was disabled on or before June 30, 1992, the last date she was insured.

### A. Disability Determination Process

Congress enacted the Supplemental Security Income Program in 1972 "to assist 'individuals who have attained age 65 or are blind or disabled' by setting a guaranteed minimum income level for such persons." *Sullivan v. Zebley*, 493 U.S. 521, 524, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (quoting 42 U.S.C. § 1381).

In *Plummer v. Apfel*, 186 F.3d 422 (3d Cir.1999), the Third Circuit outlined the applicable statutory and regulatory process for determining whether a disability exists:

In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability. In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.... In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment....

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work....

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.

*Id.* at 427–8 (internal citations omitted).

### B. Listing Determination

 Plaintiff first challenges the Commissioner's step three listing determi-

nation. At this stage of the disability evaluation process, the Commissioner determines whether the claimant's impairment matches, or is equivalent to, one of the listed impairments in the applicable regulation, 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (2001). *Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112, 119 (3d Cir.2000). "If the impairment is equivalent to a listed impairment, then [the claimant] is *per se* disabled and no further analysis is necessary." *Id.* Each impairment listed in 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (2001) "is defined in terms of several specific medical signs, symptoms, or laboratory results . . . . For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan*, 493 U.S. at 530, 110 S.Ct. 885 (emphasis in original).

Plaintiff asserts that the impairment to her upper right extremity met or equaled the requirements of listing 1.13 as of June 30, 1992. The listing specifies:

> 1.13 *Soft tissue injuries of an upper or lower extremity* requiring a series of staged surgical procedures within 12 months after onset for salvage and/or restoration of major function of the extremity, and such major function was not restored or expected to be restored within 12 months after onset.

20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (2001)

The Third Circuit has found that listing 1.13 "addresses only those situations in which the surgical procedures themselves contribute to the claimant's inability to work." *Knepp v. Apfel*, 204 F.3d 78, 87 (3d Cir.2000). In *Knepp*, the court affirmed the Commissioner's determination that amputation of claimant's left arm immediately after being injured by electrocution did not meet or equal listing 1.13 because amputation was not a series of surgical procedures to restore function.

*Id.* at 86. The *Knepp* court cited cases from the Sixth and Seventh Circuits in support of its interpretation of the listing. The Seventh Circuit determined that listing 1.13 is

> directed to the loss of the use of one extremity, not in itself disabling under the regulations, where restoration of function will require repeated, staged surgical procedures over a lengthy period, thus making an individual who would otherwise be capable of substantial gainful employment unavailable for work because of these repeated surgical procedures.

*Knepp*, 204 F.3d at 86 (quoting *Waite v. Bowen*, 819 F.2d 1356, 1359 (7th Cir.1987)). Similarly, the Sixth Circuit concluded that listing 1.13 was "meant to address a claimant who is rendered disabled as a result of being unavailable for employment during the course of [ ] staged surgical procedures and recovery periods." *Knepp*, 204 F.3d at 86 (citing *Lapinsky v. Secretary of Health and Human Services*, 857 F.2d 1071, 1073 (6th Cir.1988)). "Accordingly, the courts construe [listing 1.13] as applicable only to persons undergoing surgical procedures designed to restore functionality." *Knepp*, 204 F.3d at 86.

The Eighth Circuit has also interpreted listing 1.13, concluding that the listing requires surgeries to be "staged," not just a series of surgeries over a period of years, and must be undertaken for the purpose of restoring strength and function, not solely to relieve pain. *Senne v. Apfel*, 198 F.3d 1065, 1068 (8th Cir.1999).

In the case at bar, plaintiff had only one surgery performed within 12 months of her February 1983 injury, when a ganglion that had developed on her right hand was removed in September 1983. (D.I. 4 at 100) The next surgery, in March 1984, removed a neuroma that had developed in

the scar tissue from the first surgery.[8] (*Id.* at 98) Nothing in the record indicates that this second surgery was "staged" to follow the first surgery or was part of a "series" of surgical procedures. A "staged series" implies an intentional process in which surgery must be done in phases to achieve the desired results.[9] Furthermore, the second surgery did not take place "within 12 months after onset" of plaintiff's soft tissue injury. As noted above, only one surgery took place within the 12 month time frame, and one surgery cannot be a "series of staged surgical procedures within 12 months after onset" of the soft tissue injury.

Circuit courts have narrowly applied listing 1.13 to claimants who meet disability requirements because of staged surgeries and recovery periods. In the case at bar, plaintiff claims that severe pain in her right hand and arm, caused by a soft tissue injury, renders the extremity useless and prevents her from working at substantial gainful employment. The surgeries themselves are not the underlying cause of her inability to work.[10] This is not a situation where the claimant is "rendered disabled as a result of being unavailable for employment during the course of [ ] staged surgical procedures and recovery periods," *Knepp*, 204 F.3d at 86, or where "staged surgical procedures over a lengthy period ... [make] an individual who would other-

wise be capable of substantial gainful employment unavailable for work because of these repeated surgical procedures," *Waite*, 819 F.2d at 1359.

Accordingly, the court finds that the Commissioner had substantial evidence to support the determination that plaintiff did not meet the requirements of listing 1.13.

## C. Residual Functional Capacity to Perform Work

Plaintiff also challenges the Commissioner's step five determination that she has residual functional capacity to perform substantial gainful work. At this stage of the disability determination process, the burden shifts to the Commissioner to prove that claimant is capable of performing work available in the national economy. *Plummer,* 186 F.3d at 428. The Commissioner considers the claimant's age, education, past work experience, and residual functional capacity to determine whether the claimant is capable of work. 20 C.F.R. § 404.1520(f)(1). If the claimant suffers from significant non-exertional limitations, such as pain or psychological difficulties, the ALJ must determine, based on the evidence in the record, whether these non-exertional limitations limit the claimant's ability to work beyond the work capacity obtained from reviewing the Social Security regulation "grids."[11] *See* 20 C.F.R.

---

8. The surgery treated "a post-traumatic neuroma that had developed after treatment of her first ganglion ...." (*Id.* at 141) (emphasis added)

9. The dictionary defines staged as "arranged or taking place in stages" and a stage as "a period or step in a process, activity, or development." *Webster's Third New International Dictionary* 2219 (Merriam–Webster 1993).

10. This is not to say that the surgeries were not intended to restore function to the right upper extremity. Defendant argues that plaintiff does not meet the listing because the surgeries were meant to reduce pain, not re-

store function. However, the medical evidence indicates that the major reason for loss of function is the pain, so the court does not agree that the "sole" purpose of the surgeries was to reduce pain. Nevertheless, this argument is moot, because the court finds plaintiff does not meet listing 1.13 on other grounds.

11. The grids require the ALJ to consider the claimant's age, educational level, previous work experience, and residual functional capacity in determining what work the claimant may be able to do. *See* 20 C.F.R. § 404.1545(a); 20 C.F.R. § 404, subst. P, app. 2 (1999).

§ 404.1569a(c)-(d). If the claimant's non-exertional limitations are substantial, the ALJ uses the grids as a "framework" only and ordinarily seeks the assistance of a vocational specialist to determine whether the claimant can work. *See Santise v. Schweiker*, 676 F.2d 925, 935 (3d Cir.1982); 20 C.F.R. § 404, subst. P, app. 2, § 200(d)-(e).

■ To be denied disability benefits, the claimant must be able to engage in substantial gainful work activity, not just any work activity. *See* 42 U.S.C. 423(d)(2)(A); 20 C.F.R. 404.1505(a). The Third Circuit requires that the claimant be able "to perform any work on a regular, continuing or sustained basis" to be found capable of substantial gainful activity. *Kangas v. Bowen*, 823 F.2d 775, 778 (3d Cir.1987).[12] The Third Circuit has also held that "sporadic or transitory activity does not disprove disability" and such activities demonstrate a claimant's inability to engage in substantial gainful activity. *Smith v. Califano*, 637 F.2d 968, 971–972 (3d Cir.1981).[13]

Other circuits have also imposed a durational requirement on substantial gainful activity. *See Gatliff v. Commissioner of the Social Security Admin.*, 172 F.3d 690,

693–4 (9th Cir.1999) (citing cases in the Third, Fourth, Sixth, Ninth, Tenth, and D.C. Circuits).[14] In *Gatliff*, the Ninth Circuit reversed the denial of disability benefits and held that "substantial gainful activity means more than merely the ability to find a job and physically perform it; it also requires the ability to hold the job for a significant period of time." *Id.* at 694. The court also concluded that two months was not a significant period of time, citing Social Security regulations regarding unsuccessful work attempts. *Id.* On the other hand, the court indicated that a year could be considered a significant period of time. *Id.* at 693 (citing *Tylitzki v. Shalala*, 999 F.2d 1411 (9th Cir.1993) (holding that a series of jobs, each lasting almost a year in length, constituted substantial gainful activity)).

It is also important to note that Social Security regulations themselves provide that, in determining residual functional capacity, the Commissioner must assess the claimant's capacity "for work activity on a regular and continuing basis." 20 C.F.R. 404.1545(b) (2001).

**12.** In *Kangas*, plaintiff suffered from chronic lung disease that required him to be hospitalized eight times in a sixteen-month period, and a medical advisor testified at the ALJ hearing that his lung infections required hospitalization as often as every two to three months for a week at a time, followed by a one to two week recovery period. *Kangas*, 823 F.2d at 776. The court remanded the case back to the Commissioner for reconsideration of the effect the frequent hospitalizations had on Kangas' ability to perform substantial gainful activity. *Id.* at 778.

In a more recent case, the Third Circuit refused to consider a job that lasted only four months as evidence that a claimant could perform substantial gainful activity, where there was significant evidence of a severe mental disability. *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir.2000). The claimant there had a personality disorder that made working

with others impossible and led him to either quit or be terminated from every job he had held. *Id.* at 315.

**13.** In *Smith*, the court reversed the Commissioner and found that "shopping for the necessities of life" and two instances where claimant went hunting comprised sporadic, transitory activities that failed to negate medical evidence that claimant was permanently and totally disabled by pain. *Smith*, 637 F.2d at 971–2.

**14.** The claimant in *Gatliff* had several severe mental impairments that prevented him from keeping a job for more than about two months at a time before being fired. *Id.* at 692. Over a 15 year period, the claimant had been employed sporadically in 20–30 different jobs, the longest of which lasted six to eight months. *Gatliff*, 172 F.3d at 691.

In the case at bar, plaintiff complains that the pain in her upper right extremity, and the pain medication she takes when the pain becomes severe, prevented her from working from February 1983 through June 30, 1992. Medical records from her treating physicians consistently support complaints of pain in her upper right extremity. They detail the multiple surgeries and therapies plaintiff underwent and the medications she took to try to eliminate or ameliorate that pain. As early as 1986, Dr. Arminio commented that plaintiff was "markedly disabled" and the chances of reversing her problem were "slim at best." (D.I. 4 at 147) Dr. Gallagher concurred that plaintiff's "main problem was pain in the right forearm and right hand." (*Id.* at 127) Dr. Arminio described the sporadic and unpredictable nature of the pain in a 1990 report, and he opined then that plaintiff was unemployable "because she cannot work a normal work week on any type of consistent basis in any type of job setting." (*Id.* at 140) He also concluded that plaintiff could not be "productive" during peak episodes of pain. (*Id.* at 141)

Despite this medical evidence, the ALJ implicitly concluded that plaintiff suffered only mild to moderate levels of pain during the period in question and posed hypotheticals to the vocational expert accordingly. The ALJ found the claimant's complaints of pain to be "generally credible" but "not to the extent she was totally disabled and could perform no work." (*Id.* at 24) He concluded that plaintiff's pain was not as severe prior to June 30, 1992 as it perhaps was at the time of the ALJ hearing, citing the "very little treatment" plaintiff received for several years and her sporadic work activity from 1986 to 1992 as proof that her pain "was less at that time." (*Id.*)

The evidence in the record does not support the ALJ's finding of "very little treatment," however. In the four years prior to June 30, 1992, plaintiff sought medical treatment for pain at least twenty times, was prescribed a variety of pain-killing drugs, including Vicodin and Soma, was prescribed a TENS unit, and underwent surgery on her right wrist to further try to relieve the pain. (*Id.* at 123–129, 318) By 1990, Dr. Arminio concluded that further surgery would not help and the only things plaintiff could do to reduce pain were to immobilize her arm in a splint and take painkillers. (*Id.* at 139–142) In sum, plaintiff aggressively sought treatment for her pain and underwent surgery and therapy as recommended by various physicians, but still experienced sporadic bouts of increased pain.

It was also incorrect for the ALJ to use plaintiff's sporadic work activity from 1986 to 1992 as evidence that her pain "was less at that time." This is inconsistent with the ALJ's own findings that the work activity in 1986, 1988, and 1990 was not substantial gainful activity.[15] If anything, plaintiff's sporadic employment and inability to stay in one job for any period of time provide evidence that she was disabled by her pain during that time. *See Smith,* 637 F.2d at 971–2.

Furthermore, the ALJ inappropriately focused on whether plaintiff could perform work at all, not on whether she could engage in sustained, regular work activity. Besides citing plaintiff's sporadic work attempts as evidence that she could work, the ALJ noted her attendance at computer school for a short period of time; however, this is the type of "sporadic or transitory activity" that *Smith* said does not disprove disability. The ALJ also gave "no weight"

---

15. The ALJ withheld judgment on whether plaintiff's work activities during 1991 constituted substantial gainful activity.

to Dr. Arminio's opinion that plaintiff was "totally unable to engage in all work activity" because the doctor had stated that plaintiff could sometimes use her upper right extremity "rather successfully" and that claimant felt less pain when her arm was immobilized in a splint. (*Id.* at 24) In 1988, Dr. Arminio had even stated that plaintiff might be able to perform one-handed light work if she kept her right arm immobilized in a splint. However, the court concludes that the ALJ misinterpreted Dr. Arminio's opinion about plaintiff's work capabilities. Dr. Arminio clearly described episodic bouts of pain that prevented plaintiff from maintaining a normal work schedule. He never stated that plaintiff could never do any work at any time; rather, he opined that plaintiff's "recurrent bouts of severe pain" prevented her from working "a normal work week on any type of consistent basis in any type of job setting." (*Id.* at 140, 141) This interpretation is confirmed by Dr. Arminio's 1997 explanation that "when [plaintiff] is relatively symptom free, she could perform light sedentary activities; but she never knows when she will have a severe attack of superficial radial nerve pain . . . ." (D.I. 4 at 297) Under the circumstances, the ALJ should have given more weight to the treating physician's opinion.[16] *See Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (giving more weight to treating physician's opinion than non-treating physician's opinion).

Under the law of the Third Circuit, then, the question becomes whether plaintiff's sporadic bouts of increased pain, as described by both Dr. Arminio and plaintiff, prevented her from engaging in substantial gainful activity. As the Court made

clear in *Kangas*, plaintiff must be able to perform work on "a regular, continuing or sustained basis" to be capable of substantial gainful activity. *Kangas*, 823 F.2d at 778.

Plaintiff's description of her level of pain at the ALJ hearing was a "six" on a scale of ten on a normal day, with some days better or worse. The worst days prevented her from even getting out of bed, and she testified that this had occurred approximately six times in the previous two or three years. Dr. Arminio described plaintiff's bouts of increased pain as "severe." From this record evidence, and the ALJ's conclusion that plaintiff's testimony as to her pain was generally credible, the only reasonable conclusion is that plaintiff suffered from moderate levels of pain on "normal" days and suffered from severe pain on the "bad" days.

The vocational expert testified that plaintiff could perform several jobs in the national economy with moderate levels of pain, but admitted on cross-examination that severe pain would prevent her from doing any jobs. The vocational expert also testified that the side effects from the pain medication plaintiff was taking, as described by plaintiff, "would make it difficult for her to get a job." At least one of these pain medications, Vicodin, was prescribed to plaintiff multiple times in 1991 and 1992, the period right before her disability eligibility ended.

As discussed earlier, her treating physician believed her to be unable to maintain a regular work schedule or a normal job because of her unpredictable, severe bouts of pain. Evidence also shows plaintiff

---

16. The court does not find Dr. Arminio's opinions to be inconsistent with those of the other treating physicians. For instance, statements at various times by Dr. Gallagher that plaintiff could return to light work or could drive a car for an hour do not directly address

whether plaintiff's bouts of severe pain prevented her from maintaining a normal work schedule. As Dr. Arminio noted, when plaintiff was "relatively symptom free" she could perform work—the difficulty occurred during the times of greater pain.

performed only low-paying, sporadic work from 1986 to 1991, further confirming her inability to perform substantial work. The record evidence does not support a finding that plaintiff was capable of performing work on "a regular, continuing or sustained basis." Accordingly, the court concludes that the Commissioner lacked substantial evidence to support the determination that plaintiff could perform substantial, gainful work activity in the national economy.

The next question is whether the court should remand back to the Commissioner for reconsideration, or whether the court should reverse the Commissioner's decision and award benefits.

The decision to award benefits directly rather than remanding to the Commissioner is warranted when "the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221. In particular, "where further administrative proceedings would simply prolong the claimant's ultimate receipt of benefits," a direct award, rather than remand, is especially appropriate. *See id.* at 223.

Substantial evidence on the record indicates that plaintiff was disabled during the relevant time period and, therefore, entitled to benefits. In particular, the court notes the aggressive treatment sought by plaintiff to try to reduce or eliminate her pain, and her treating physician's opinion that, over the several years he treated her, plaintiff experienced severe bouts of pain that prevented her from maintaining a normal, regular work schedule. Plaintiff's sporadic work attempts and brief attempt at computer school further corroborate the medical evidence and plaintiff's own testimony about the severity of her pain and her inability to maintain a normal work schedule. As in *Smith v. Califano*, "the

sporadic and transitory nature of [plaintiff's] activities demonstrate not [her] ability but [her] inability to engage in substantial gainful activity." *Smith*, 637 F.2d at 972. Furthermore, vocational expert evidence on the record supports the conclusion that plaintiff cannot perform any jobs available in the national economy when she experiences severe bouts of pain. Although the record lacks direct evidence about the frequency and duration of plaintiff's severe bouts of pain during the relevant time period, Dr. Arminio's opinions and plaintiff's sporadic work activity provide sufficient evidence to infer that she could not hold a job on "a regular, continuing or sustained basis." *Kangas*, 823 F.2d at 778. The court thus finds that the administrative record has been fully developed and further administrative proceedings would simply prolong the claimant's ultimate receipt of benefits.

In sum, the court finds that substantial evidence on the record supports a finding that plaintiff was disabled on or before June 30, 1992. The court, therefore, grants summary judgment for plaintiff, reverses the Commissioner's denial of benefits, and awards benefits to plaintiff.

### V. Conclusion

Based on the record, the court concludes that the Commissioner lacked substantial evidence to support the determination that plaintiff could perform substantial, gainful work activity in the national economy. In addition, the court finds that substantial evidence on the record supports a finding that plaintiff was disabled on or before June 30, 1992. The court, therefore, grants summary judgment to plaintiff, reverses the Commissioner's denial of benefits, and awards benefits to plaintiff.